This is Matal. May it please the court, my name is Stephen Hultquist. I'm representing Zoomessence, the patent owner of U.S. Patent 8-939-388, which is on holding that claims 116, 19, and 28-30 are invalid on various prior art grounds. The minority opinion in that case of Judge Worth held that the petitioner had not met the burden of showing unpatentability of those claims. What I'd like to do this morning is to go through two predicate inquiries. I think all of the issues that are presented are aptly briefed in the appeal brief. Can I ask you a logistic question before we begin, which is if we were to agree with the board on the first claim construction temperature limitation, does that end the case? Is there a reason that we need to decide both issues, if we were to agree on one? No, I think both of those, the temperature and the dried powder, require consideration. I think the board's reasoning shows a fallacy that I'll bring out. No, I know you disagree with them. I'm just asking you a sort of technical logistic question, which is, hypothetically, if we were to agree with the board on its construction of the first limitation, that would end the case. Is there a reason necessary to affirm the board on both of those? I respectfully suggest that it would require holding on both of those aspects. Okay. Thank you, Your Honor. If we look at the issues that are collapsed to those two fundamental inquiries, I think we know what they are. The temperature limitation and the dried powder recitation in Claim 1. I'll dispose my remarks to Claim 1, the other claims 16, 19, 20, 30, or either dependent directly or indirectly, or else they are incorporated by reference in those other claims. In terms of the BRI standard and its applicability to those two limitations that I'll discuss this morning, this court has held in suitco in 2010 that BRI requires contextual consideration of the specification. So what I'll do this morning is to go through specification portions that speak to the temperature limitation and then direct remarks to the decision of the majority at the PTAB panel and show the error in the application of that contextual consideration of the specification. Can I ask you, is there something in the specification that you can point toward that discusses having more than one drying fluid in the... So air plus something else, which is, I think, not unimportant to your response to the board's reliance on the Claim 1 to Claim 5 relations. Right. There is recitation that tracks the Claim 2 recital, and I know Claim 2 has only been raised inferentially in connection with the issues here, but Claim 2 talks about without the presence of any heated drying fluids, and that language is also found in the specification itself. So there is antecedent reference in the specification, and I believe that's in the summary section, if I recall, Your Honor. Okay. Yes. It's at column 2 at line 57, but I would also point out that air is exemplified as the drying fluid, which of course is nitrogen, oxygen, and a few other gas species. So there are, in air, multiple fluids. So if we revert to the first inquiry concerning the temperature limitation, Claim 1 recites that the drying fluid comprises air at temperature that's above the freezing temperature of the air below 100 degrees centigrade. The dispositive nature of that requires that we look to the specification. Specification mentions 100 degrees centigrade in two instances. One in the summary of the invention section, which is at column 2, line 62 to 64, and there the summary states, preferably a temperature of the non-heated drying fluid is less than about 100 degrees centigrade at introduction into the drying chamber. So that's the summary section. The detailed description section at column 7, lines 27 to 29, state that a temperature of the non-heated drying fluid, parenthetically air, introduced into the drying chamber 107 may be at least one of less than about 100 degrees centigrade. And then it goes on with a series of lesser temperatures, 75, 45, 30, 35, 30 ambient temperature as successive alternative limitations. So those references, summary section saying at introduction into the drying chamber, and the subsequent detailed description section speaking to drying fluid air introduced into, create the context against which it's evident that the temperature limitation, and I'll But establish the context that that temperature limitation of maximum temperature of the drying fluid air is applicable each and every position, everywhere within the interior volume of the drying chamber. Am I remembering right, there was some point, I think it was the board, to the following effect, and correct me if you can guess what I'm getting at if I'm not articulating it right. If you had air and another drying fluid, and the other drying fluid was coming in at 170 degrees centigrade, some of the air is going to get very hot. And so a view that none of the air anywhere in the chamber can be above 100 degrees centigrade wouldn't make much sense if under, I forget, one of the claim two or four or five or whatever it is, implicitly acknowledges the possibility of some other drying fluid being 75% hotter than that. Well, I think you have to look at the claim, your honor. The claim says that the drying fluid comprising air is at that temperature condition, i.e. below 100 degrees centigrade. And if you look in the interior volume of a drying chamber, you've got liquid product that's being sprayed in, and you've got the air that's being injected from the inlet passing to the outlet. And so you've got a stirred or a mixed environment. And to the extent that you've got a gas that comes in with another gas, those gases are going to be mixed, blended. And thermodynamics will say that if you've got a hot fluid, a cold fluid, the cold fluid's going to get hotter, the hot fluid's going to get colder. Right. I mean, that's what I was thinking of. But I thought you just said, and I think this was an important part of your argument, that none of the air anywhere can be above 100 degrees centigrade. And if you have a second gas, that drying fluid, that's coming in at 170 or 175, I forget what the number is, some of that air is going to be over 100. Well, what the claim says is below 100. So if you have that situation, the deposit, then- The air is going to be, has to start out very, very, very cold. Indeed. Indeed. I mean, we can't pronounce basic thermodynamics as being operative. But given the sine qua non of air not exceeding 100 degrees centigrade in temperature, it's apparent that any temperature maldistributions relative to some equilibrium temperature has to fold in thermodynamically. And the air, in every case, has to meet the criterion that the temperature is below 100 degrees centigrade. Now, looking at this from a physiological perspective of the inlet, outlet, and the drying chamber, the detailed description section after the passage that I referred to, giving the fallback temperatures and giving the full skein of temperature limitations, goes on to illustrate, if we say, the inlet air temperature at about 40 may result in an output temperature of about 32. And what that says is very simple science, that the air traversing that interior volume of the drying chamber cools. The drying fluid in interaction with the liquid product that's being spray dried will cause evaporation. The drying fluid will diminish in temperature. And that was actually recognized by the majority at the PTAB. Let me go to the PTAB statement. They say, at some location within the internal volume of the drying chamber, there's a temperature... Can you give us a page that you're citing from in the appendix? This was at the written decision, I'm sorry, your honor, I... You don't have page numbers at the bottom? It's joint appendix at page 11. Okay. They go through the discussion of some location being the location at which that temperature is measured. And then I want to read the analysis. They go through the temperature disclosures in the specification and say, based on these disclosures, we understand that the drying fluid is hotter at the inlet than at the output. And then they conclude that the upper limit of 100 degrees centigrade recited in claim one refers to the temperature of the air measured at any location within the drying chamber, including at the outlet. So what they're doing is using the lowest temperature at the outlet as their measuring rod for the maximum temperature limitation. That then permitted them to use prior art such as merit, which discloses outlet temperatures that are below 100 degrees centigrade, but have inlet temperatures vastly higher in order to declare the claim, claim one invalid as anticipated. And the other rejections are similar as far as inlet and outlet temperatures. So by delocalizing the drying fluid and saying, well, it's at some location rather than at every location, they have used, again, the lowest temperature at the outlet as the measuring rod for the maximum temperature limitation. You are well into your rebuttal, so do you want to continue, or let's hear from the government I will. Thank you, Your Honor. May it please the court. I'll just start off with the procedural question that you asked opposing counsel. There are two claim construction disputes here. If you rule on, for the PTO on either one, the board decision should be affirmed. If you agree with the board on the temperature construction, then the anticipation or rejection in view of merit stands because the only disputed limitation went to the temperature limitation. If you rule, if you agree with the board on the dried powder claim construction, then the obviousness rejection of merit in view of Scalbeck should be affirmed because Scalbeck discloses the use of air at a lower temperature, but also has this issue of whether it results in dried powder. So I think either construction, if we win on either construction, then the board decision should be affirmed. I'd like to start by talking about the dried powder construction because I think it's the most straightforward of the two. The board construed dried powder to mean particles with an outer shell sufficiently devoid of solvent so that particles encapsulate the liquid active ingredients. The board took this construction straight from the words of the claims and specification. The claims in multiple instances refer to a dried powder as one where the carrier encapsulates the active ingredient. This is also referred to in the specification multiple times in the 388 patent. Indeed, the specification in the summary of the invention at column two, looking around line 57, says that the drying is conducted for a sufficient amount of time to drive off a sufficient amount of the liquid solvent to leave dried particles, the powder, each dried particle containing the active ingredient encapsulated within the carrier. So the board simply just used the language of the claims and the specification to construe the term dried powder. Zumessison's proposed construction is dry means not wet. While that seems like a simple and straightforward construction, I don't really understand what it means. How do you judge whether something is not wet? There's nothing in the specification discussing percentage of water remaining, whether all water has to be taken out, whether some percentage can remain in. So by saying not wet, does that imply that all of the water is removed or that some specific amount of water is removed? I just don't know. That proposed construction was, I think, proposed specifically to try to avoid the Skalbeck and DeRusse references that have an additional drying step after leaving the chamber. But in both of those references, it's clear that when the powder comes out of the dried chamber, it has a carrier encapsulating the active ingredient so that the active ingredient can't escape. That's sufficient to meet the board's construction. That's sufficient in the eyes of the 388 patent. So I think the board's construction was certainly reasonable on that point. On the temperature limitation, I think there's a disconnect between the description of the preferred embodiment and the claim language here. If you look at the description of the preferred embodiment, we're using non-heated air with an inlet temperature of less than 100 degrees. We're applying an electrostatic charge to the droplets coming out of the atomizer. But if you look at the claim language, that's not what Claim 1 requires. Claim 1 says nothing about the electrostatic charge. Claim 1 says nothing about use of non-heated air. Claim 1 doesn't specify a temperature at the inlet. All of those additional features come in these later claims, Claims 2 through 5. So if we're going to go by what's in the specification with respect to the temperature limitation, then we're going to be reading all of these dependent claims into Claim 1, which I think is incorrect. So if Zoom Essence had wanted to limit the inlet temperature to below 100 degrees in Claim 1, they should have said the inlet temperature should be below 100 degrees, and that's exactly what they say in Claim 4. So I think this is just a situation where the description of the preferred embodiment is narrower than the way that Claim 1 was drafted. So if we're going to go by the language of Claim 1 and make it consistent with the other claims, then I think the board's construction is the right one, and it's reasonable. If there are no further questions... Mr. Foreman has raised several issues that I'll address in sequence. One was the question of electrostatic charge, and while it's true that electrostatic charge is described, it's described in a way in the specification that it's one of the feature set of features that permit low-temperature drying. So it's just an enabling detail for a claim that doesn't actually require it? It is a preferred in one embodiment feature, yes. So let me just briefly direct your attention to the specification of Column 5 at line 41-42. There are a number of very significant differences between the systems of Figures 1 and 2. One is the prior art inlet temperature, 180-200. Figure 2 is the flow sheet representative of the present invention. And then there is disclosure at Column 5 lines 56-58. Among the reasons that non-heated air may be used is that the story's not conventional. And then at Column 6, line 25, another reason that non-heated air may be used relates to an unconventional electrostatic charging process. And then in the specification of Column 7 at lines 23-25, the individual or combined characteristics of relative low water content and electrostatic charge permits vastly a different temperature condition. So I think there's enough interplay between those disclosure sections to say that there is no invention without that particular feature. In terms of the references to DeRusse and Scalback and the spray drying initial operation followed by a fluidized bed treatment, I would just point out to the court that in DeRusse, which was a primary reference in the obviousness rejection of Claim 1, the water content at the end of the spray drying was 10-28%. That's wet. The fluidized bed treatment then is carried out for 10-30 minutes to get a suitable dried powder product. It's not an optional second step. It's taught to be essential. It's taught as part of the processing of that liquid product. Scalback, same situation of initial spray drying, secondary treatment of fluidized bed treatment. Scalback has a lower temperature in the spray drying, but then teaches to fluidized bed treat the wet product for 1-10 hours. In a fluidized bed in which this wet mass is fluidized, put into the air to dry 1-10 hours, that tells you that that's a wet product coming from the first stage operation. I think in terms of the third issue that Mr. Foreman raised of dried powder, all we're saying is dried powder means exactly what it says, dried powder. In common parlance, we all know what dry powder is, powdered sugar, powdered cocoa, and it's a matter of common understanding what would be a dried powder. Thank you. Thank you. We thank both sides and the case is submitted.